UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUVENAL OVIDIO RICARDO PALMERA PINEDA, | ) ) | Criminal No. 02-112-12 (TFH) |
| a/k/a "Simon Trinidad" | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION FOR BILL OF PARTICULARS

**COMES NOW** the United States of America, by and through the undersigned attorney, and hereby files its opposition to defendant's motion for a bill of particulars. In support of this opposition, the United States hereby states:

### INTRODUCTION

The defendant JUVENAL OVIDIO RICARDO PALMERA PINEDA, a/k/a "Simon Trinidad" (TRINIDAD or "defendant") has filed a motion requesting a bill of particulars. The defendant has requested five categories of information including, among other things, the date of meetings with co-conspirators, when each defendant joined the conspiracy, and the names and present addresses of other co-conspirators.

The information provided by the United States in the indictment, in discovery materials disclosed and available to the defendant is more than sufficient to satisfy the purposes for a bill of particulars - namely, to inform the defendant of the nature of the charge against him so that he

1

can prepare a defense, avoid prejudicial surprise at trial, and to protect himself against a second prosecution for the same offense. A bill of particulars is not a discovery device and is not intended to force the United States to disclose the details of its case or its legal theories. Put simply, the defendant's request for information goes far beyond the proper scope and function of a bill of particulars.

Accordingly, the United States requests the Court to rule that the particulars provided to the defendant through discovery and other filings are sufficient to serve the function of a bill of particulars and that the United States need not provide any further particulars to the defendants.

## ARGUMENT

### I.      A BILL OF PARTICULARS IS NOT A DISCOVERY DEVICE

The function of a bill of particulars is to inform a defendant of the nature of the charge in the indictment with sufficient precision to enable the defendant to (1) prepare his defense; (2) avoid prejudicial surprise at trial; and (3) plead double jeopardy as a bar to any further prosecution for the same offense. *Wong Tai v. United States*, 273 U.S. 77, 82 (1927); *United States v. Butler*, 822 F.2d 1191 (D.C. Cir. 1987); *United States v. Whitehorn*, 710 F. Supp 803 (D.D.C. 1989); *United States v. Burgin*, 621 F.2d 1352 (5th Cir. 1980). A bill of particulars is not a general investigative tool for the defense, nor is it a device to compel disclosure of all the government's evidence prior to trial. *United States v. Whitehorn*, 710 F. Supp 803 at 821 (it is not the function of a bill of particulars to provide detailed disclosure of the government's evidence). Courts have uniformly held that a bill of particulars is not intended to function as a discovery device. Where, as here, the request for a bill of particulars amounts to an effort to procure evidentiary material, a bill of particulars is properly denied. *United States v. Poindexter*, 725 F.

Supp 13 (D.D.C. 1989); *United States v. Pollack*, 534 F.2d 964 (D.C. Cir. 1976); *United States v. Whitehorn*, 710 F. Supp 803 (D.D.C. 1989).

The defendant's bill of particulars request consists of seven separately numbered sub-parts. The United States' overriding objection is that the defendant's request for information goes well beyond what the law requires the government to produce in a bill of particulars. These requests are directed at the *evidence* of the charges rather than the *nature* of the charges. In addition, the motion is tantamount to a request for the United States' legal conclusions. Succinctly put, "[a bill of particulars] is not designed to compel the government to detailed exposition of its evidence or to explain the legal theories upon which it intends to rely at trial." *Burgin*, 621 F.2d at 1359.

The defendant, specifically, is inappropriately seeking general discovery regarding the conspiracy. In a conspiracy case, a bill of particulars may not be used to compel the government to provide the essential facts regarding the existence and formation of the conspiracy. *United States v. Rosenthal*, 793 F.2d 1214, 1227 (11th Cir. 1986), *opinion modified in part*, 801 F.2d 378 (11th Cir. 1986), *cert. denied*, 480 U.S. 919 (1987). Courts have repeatedly denied requests for a bill of particulars, like the defendants' which seek "the identities and addresses of unindicted co-conspirators, dates and locations of alleged acts in furtherance of the conspiracy, and [other] detailed information . . . ." *See, e.g., United States v. Colson*, 662 F.2d 1389, 1391 (11th Cir. 1981); *United States v. Whitehorn*, 710 F. Supp 803 (D.D.C. 1989)(denying request for a bill of particulars identifying each act and statement by each co-conspirator in furtherance of the conspiracy and stating the time, place and circumstance of the act or statement, the participants and persons present).

Furthermore, a bill of particulars is not intended to eliminate any chance of surprise about the charged conspiracy; it is intended only to avoid *prejudicial* surprise about the charge. As stated in *United States v. Manetti*, 323 F. Supp. 683 (D. Del. 1971):

> [I]t is not the function of a bill of particulars to fully inform the defendant of the evidence which the government will present. Of necessity, therefore, while one of the legitimate functions may be to reduce the role of surprise in criminal cases, it will not do to say that the rule must be applied to shield defendants from the possibility of confrontation with unanticipated evidence. Nor is the rule intended to give the defendant the benefit of the government's investigative efforts. *Id.* at 695 (footnotes omitted).

Much of the government's evidence in this case will consist of conversations, meetings, and acts in which the defendant himself participated. Where the evidence includes conversations and meetings in which a defendant participated, such defendant can "hardly [be] surprised by the government's proof at trial." *United States y. Cole*, 755 F.2d 748, 760 (11th Cir. 1985).

## II. THE COURT HAS DISCRETION TO DENY A MOTION FOR A BILL OF PARTICULARS

A motion for a bill of particulars rests within the sound discretion of the trial court. *United States v. Butler*, 822 F.2d 1191 (D.C. Cir. 1987); *United States v. NYNEX Corporation*, 781 F. Supp 19 (D.D.C. 1991). A defendant possesses no right to a bill of particulars. *United States v. Burgin*, 621 F.2d 1352, 1358 (5th Cir. 1980), *cert. denied*, 484 U.S. 827 (1987). In fact, a court need not order a bill of particulars at all if it finds the indictment adequately apprises the defendants of the charges against them, *Wong Tai*, 273 U.S. at 82, or that the information sought is already in the defendant's possession. *Butle*r, 822 F.2d at 1193.

When considering whether to order a bill of particulars, "[t]he important question is whether the information sought is necessary, not whether it is helpful." *United States v. LaMorte*,

4

744 F. Supp. 573, 577 (S.D.N.Y. 1990). In short, a motion for a bill of particulars is properly denied where, as here, its requests go to the Government's proof rather than to a clarification of the indictment. *Whitehorn*, 710 F. Supp at.821; *United States v. Espy,* 989 F. Supp 17, 34 (D.D.C. 1997).

### III.  BECAUSE TITLE 21 § 963 REQUIRES NO PROOF OF OVERT ACTS, THE DEFENDANT IS NOT ENTITLED TO A DESCRIPTION OF OVERT ACTS

The violation of 21 U.S.C. § 963 is the agreement itself. An act in furtherance of the agreement need not be alleged or proved. *United States v. Montgomery*, 150 F.3d 983 (9th Cir. 1998). In *Montgomery*, the Ninth Circuit began by noting that the Supreme Court in *United States v. Shabani*, 513 U.S. 10, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) had held that the government need not prove the commission of any overt acts in furtherance of the conspiracy in order to establish a violation of 21 U.S.C. § 846. The *Montgomery* court, pointing out that the language used by Congress in section 963 and section 846 was identical, and that the statutes were enacted at the same time as part of the same public law, then concluded that "[a]pplication of the reasoning of the court in *Shabani* leads logically to the conclusion that 'proof of an overt act' is not a required element of a conspiracy charge pursuant to section 963." *Montgomery*, 150 F.3d at 998.

This Circuit has reached the same conclusion in reviewing a claim that the district court erred in refusing to compel the government to provide a bill of particulars. In *United States v. Mejia*, 448 F.3d 436 (D.C. Cir. 2006), the Court of Appeals stated that although the indictment did not allege any overt acts, the district court had correctly ruled that the language of Section 963 does not call for any to be set forth in the indictment, nor do any have to be committed in

5

order for a 963 violation to be proven. *Id* at 445. Accordingly, the United States objects to the defendants' requests seeking information about overt acts committed in furtherance of the charged conspiracy.

## IV.     THE INDICTMENT CLEARLY SETS FORTH PARTICULARS ABOUT THE CONSPIRACY

The indictment in the present case is, what is often referred to as, a "speaking indictment." The indictment sets forth, in the *Introduction*, nineteen paragraphs which include, among other things, brief descriptions of the major co-conspirators and their roles in the drug trafficking activities charged in the indictment. Pages six through ten of the indictment set forth the *Manner and Means* of the conspiracy, and includes nineteen paragraphs detailing how the defendants accomplished the goal of the conspiracy. The indictment then ennumerates fifteen specific overt acts, most of which occurred from 1998 through 2003. These overt acts specify dates, places, locations and persons involved in specific acts in furtherance of the conspiracy including meetings, deliveries of cocaine, and the delivery of money and weapons.

The indictment in this case is very clear. It charges the defendant with a one-count violation of the narcotics statutes. Despite charging only one count, the indictment runs fifteen pages in length. It states when the charged narcotics trafficking conspiracy began and when it ended. It states the purpose of the conspiracy. It sets forth the substantial terms of the conspiracy and provides examples of the means and methods employed by the conspirators to carry out the illegal agreement. It defines the geographic area affected by the conspiracy. It describes the manner in which the defendant and his co-conspirators operated. The indictment in this case more than adequately apprises the defendant of the charge against him so that he can prepare for

trial and avoid unfair surprise. Finally, most of the government's evidence in this case will consist of conversations and meetings in which the defendant himself participated and actions he took in FARC controlled territory.

IV.   **DISCOVERY WHICH HAS BEEN PROVIDED TO THE DEFENDANT MORE THAN SATISFIES THE LEGAL REQUIREMENTS THAT THE DEFENDANT BE FULLY INFORMED OF THE CHARGES AGAINST HIM**

An important consideration in deciding whether particulars should be granted is the sufficiency of the information already available to the defendant prior to trial. If the indictment is sufficiently specific, or if the requested information is available in some other form, then a bill of particulars is not required. *United States v. Coleman*, 940 F. Supp 15 (D.D.C. 1996)(detailed indictment and fourteen boxes of discovery materials sufficient);*United States v. Butler*, 822 F.2d 1191 (D.C. Cir. 1987)(indictment and 150 boxes of documents, records and memoranda turned over to defendant sufficient). Thus, the fact that the defendant has been provided extensive discovery can obviate the need for a bill of particulars. *United States v. Whitehorn*, 710 F. Supp 803 (D.D.C. 1989); *United States v. Poindexter*, 725 F. Supp 13 (D.D.C. 1989)(further particulars including extensive discovery and providing all documents government intended to introduce at trial provided defendant adequate notice).

The indictment in this case, together with discovery already provided, and infomation supplied through other documents, sufficiently informs the defendant of the nature of the charges against him so that he can prepare his defense, avoid surprise at trial and plead double jeopardy. As a result, the purpose of a bill of particulars has been satisfied. Information which the government has already provided that sets forth particulars regarding the nature of the conspiracy and the role of the defendant, as well as indicted and unindicted co-conspirators in the conspiracy

includes:

A.  **Extradition Documents**

The defendant's extradition documents include affidavits by both a government prosecutor and the DEA case agent regarding the narcotics charges. These affidavits clearly set forth particulars regarding the charges against the defendant. They provide specific details regarding the conspiracy, including the role of major participants in the conspiracy and a specific description of the conspiracy including the involvement of TRINIDAD and the FARC. The affidavits identify the town in Colombia, Barranco Minas, located on the Guaviare River in eastern Colombia, as the center of their cocaine trafficking activities. The affidavits further set forth the use of airstrips to transport the cocaine, the fact that TRINIDAD supplied large amounts of Colombian currency to other members of the FARC for use in conducting drug trafficking activities, and that he attended daily meetings in the *Zona de Distension* where he and other senior FARC leaders directed drug trafficking activities by issuing orders regarding the acquisition, transportation and sale of cocaine by various fronts of the FARC.

The affidavit of the DEA agent, in particular, sets forth nineteen paragraphs of information providing specifics regarding the defendant and the conspiracy. This information, as set forth below from the from the agent's affidavit, by itself, provides more than the law requires in terms of a bill of particulars:

> 16. According to at least two of the DEA's confidential sources, JORGE BRICENO SUAREZ held daily meetings in the Zona de Distension that were attended by senior FARC leaders, including **JUVENAL OVIDIO RICARDO PALMERA PINEDA**, at which JORGE BRICENO SUAREZ directed FARC drug trafficking activities by issuing orders regarding the acquisition, transportation and sale of cocaine by various fronts of the FARC and the movement of money. When JORGE BRICENO SUAREZ was unavailable,

**JUVENAL OVIDIO RICARDO PALMERA PINEDA** conducted the daily meetings on behalf of JORGE BRICENO SUAREZ and **JUVENAL OVIDIO RICARDO PALMERA PINEDA** directed FARC drug trafficking activities by issuing orders regarding the acquisition, transportation and sale of cocaine by various fronts of the FARC and the movement of money. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

17. According to at least two of the DEA's confidential sources, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** managed and controlled money for the FARC that was used by the FARC to conduct cocaine trafficking activities. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

18. According to at least one DEA confidential source, on various occasions, at the direction of JORGE BRICENO SUAREZ, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** supplied large amounts of Colombian currency to other members of the FARC for use in conducting drug trafficking activities. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

19. According to the DEA's confidential sources, one of the FARC fronts that engaged in cocaine trafficking at the direction of JORGE BRICENO SUAREZ and **JUVENAL OVIDIO RICARDO PALMERA PINEDA** was the 16th front of the FARC commanded by TOMAS MOLINA CARACAS.

20. According to the DEA's confidential sources, JORGE BRICENO SUAREZ, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** and TOMAS MOLINA CARACAS worked closely together in planning and conducting FARC cocaine trafficking activities. When he was present in the Zona de Distension, TOMAS MOLINA CARACAS regularly attended the daily meetings held by JORGE BRICENO SUAREZ and **JUVENAL OVIDIO RICARDO PALMERA PINEDA**.

21. According to at least seven of the DEA's confidential sources, TOMAS MOLINA CARACAS, OSCAR CARACAS VIVEROS, GUILLERMO GALVES PARDO, LUIS FERNANDO DA COSTA, LEONARDO DIAS MENDONCA and EMIVAL BORGES DAS DORES, and other co-conspirators, used the Colombian town of Barranco Minas, located on the Guaviare River in eastern Colombia, as the center of their cocaine trafficking activities from 1994 to February 2001. TOMAS MOLINA CARACAS, and other members of the FARC, controlled cocaine trafficking activities in Barranco Minas and the surrounding area.

22. According to at least seven of the DEA's confidential sources, TOMAS MOLINA CARACAS, other members of the FARC, GUILLERMO GALVES PARDO, and other co-conspirators, arranged for cocaine manufactured in laboratories in portions of eastern Colombia to be transported to Barranco Minas and stored there.

23. According to at least five of the DEA's confidential sources, JORGE BRICENO SUAREZ, TOMAS MOLINA CARACAS, and other members of the FARC, arranged for cocaine in the possession of other fronts of the FARC to be transported to the 16th front of the FARC.

24. According to at least seven of the DEA's confidential sources, international drug traffickers came to Barranco Minas to purchase cocaine because TOMAS MOLINA CARACAS, and other members of the FARC, provided an abundant supply of cocaine and a safe haven for cocaine trafficking activities.

25. According to at least seven of the DEA's confidential sources, TOMAS MOLINA CARACAS, and other members of the FARC, sold cocaine to international drug traffickers LUIS FERNANDO DA COSTA, LEONARDO DIAS MENDONCA, EMIVAL BORGES DAS DORES, and others, in exchange for money, weapons and equipment. TOMAS MOLINA CARACAS reported his significant cocaine sales transactions to JORGE BRICENO SUAREZ, and JORGE BRICENO SUAREZ approved such cocaine transactions.

26. According to at least seven of the DEA's confidential sources, LUIS FERNANDO DA COSTA, LEONARDO DIAS MENDONCA and EMIVAL BORGES DAS DORES, and other co-conspirators, arranged with TOMAS MOLINA CARACAS, and other members of the FARC, for airplanes carrying United States currency, weapons and equipment to land in Barranco Minas and at other locations controlled by the 16th front of the FARC. LUIS FERNANDO DA COSTA, LEONARDO DIAS MENDONCA and EMIVAL BORGES DAS DORES, exchanged the United States currency, weapons and equipment for cocaine provided by TOMAS MOLINA CARACAS, and other members of the FARC, including OSCAR CARACAS VIVEROS.

27. According to at least seven of the DEA's confidential sources, when airplanes arrived in Barranco Minas, members and associates of the conspiracy unloaded the United States currency, weapons and equipment from the airplanes and then loaded the airplanes with cocaine.

28. According to at least seven of the DEA's confidential sources, TOMAS MOLINA CARACAS, and other members of the FARC, permitted the airplanes loaded with cocaine to depart from Barranco Minas. The cocaine-laden airplanes

then flew beyond the territorial limits of Colombia to other countries.

29. According to at least two of the DEA's confidential sources, TOMAS MOLINA CARACAS sent large amounts of United States and Colombian currency that he received from the sale of FARC cocaine to JORGE BRICENO SUAREZ and **JUVENAL OVIDIO RICARDO PALMERA PINEDA**. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** received this currency after December 17, 1997.

30. According to one of the DEA's confidential sources, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** visited Barranco Minas and met with TOMAS MOLINA CARACAS, and other co-conspirators, and received bundles of United States currency from TOMAS MOLINA CARACAS. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

31. According to one of the DEA's confidential sources, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** visited the area controlled by TOMAS MOLINA CARACAS and the 16th front and announced to the local coca growers the price the FARC would pay them for each kilogram of cocaine base and advised them that the quality of their cocaine base was inferior and needed to be improved. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

32. According to the DEA's confidential sources, the cocaine sold by TOMAS MOLINA CARACAS, and other members of the FARC, was transported from Colombia to the United States and other countries.

33. According to the DEA's confidential sources, JORGE BRICENO SUAREZ, **JUVENAL OVIDIO RICARDO PALMERA PINEDA** and TOMAS MOLINA CARACAS, and other co-conspirators, spoke of sending cocaine to the United States. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA** did this after December 17, 1997.

34. According to the DEA's confidential sources, JORGE BRICENO SUAREZ, JUVENAL **OVIDIO RICARDO PALMERA PINEDA**, TOMAS MOLINA CARACAS, OSCAR CARACAS VIVEROS, GUILLERMO GALVES PARDO, LUIS FERNANDO DA COSTA, LEONARDO DIAS MENDONCA, EMIVAL BORGES DAS DORES, JOSE LUIS AYBAR CANCHO, LUIS FRANK AYBAR CANCHO, and DENIS SILVA RUIZ, and other co-conspirators, attended meetings, which occurred between and among different combinations of co-conspirators over the course of the conspiracy, to discuss cocaine trafficking. There is evidence that **JUVENAL OVIDIO RICARDO PALMERA PINEDA**

did this after December 17, 1997.

B.    **Rule 16 Discovery Materials**

The government has filed nine discovery packets which include over 200 pages of materials including transcripts and recordings of foreign court proceedings, statements of the defendant, videotapes and DVDs, documents and photographs.

C.    **Government Motions Provide Particulars**

In addition, motions filed by the government in this case supply particulars regarding the conspiracy charged in the indictment and the defendant's role in the criminal enterprise.

   1. **Government's Third Motion Under the Speedy Trial Act For Continuance Based On Complex Case.**

On February 15, 2005, the government filed a motion for a continuance and to exclude time under the Speedy Trial Act. Paragraph five of that motion clearly sets forth specifics regarding TRINIDAD's role in the conspiracy:

> 5. According to the indictment, Palmera Pineda, and three other defendants are members of the *Fuerzas Armadas Revolucionarias de Colombia*, or "FARC," an armed guerilla group operating in the Republic of Colombia. The indictment also charged associates of the FARC and international drug traffickers who purchased cocaine from the FARC. The FARC has been declared a foreign terrorist organization by the State Department. The indictment alleges that from 1994 to the date of indictment, Palmera Pineda, and the three FARC defendants were members of a cocaine trafficking organization that sold cocaine to international drug traffickers in exchange for money, weapons and equipment for the FARC. The cocaine was then transported from Colombia to the United States and other countries. Co-defendant Galves Pardo operated cocaine labs and supplied cocaine to the FARC.

   2. **Government's Motion to Detain the Defendant Pending Trial**

The detention motion filed by the government in this case provides additional particulars of the nature of the conspiracy and the role of the defendant, as well as other co-conspirators, in

trafficking cocaine to the United States. *See, e.g. Government's Motion to Detain Defendant Pending Trial* filed January 3, 2005:

> 2. Palmera Pineda is a member of the *Fuerzas Armadas Revolucionarias de Colombia*, or "FARC." The FARC is a narco-terrorist guerrilla group operating in Colombia. It is reported to have approximately 18,000 armed members. The FARC is organized into approximately 64 "fronts" or operational units. There are seven "blocks" in the FARC and each "block" controls and supervises numerous "fronts." The objective of the FARC is to seize political power in Colombia and institute Marxist reforms. DEA estimates that the FARC controls approximately 70% of the Colombian cocaine trade, and that approximately 80-90% of the cocaine shipped to the United States comes from Colombia. The FARC produces and distributes thousands and thousands of kilograms of cocaine per month for export to the U.S. and other countries. The FARC controls large portions of Colombia and finances its war with the Colombian government by engaging in drug trafficking and by other means including kidnaping Colombian and American citizens. The FARC uses murder, violence, intimidation and bribery in pursuit of its drug trafficking and other unlawful activities. Drug trafficking is the life-blood of the FARC because it enables the FARC to acquire weapons, ammunition and equipment necessary to carry on its civil war with the Colombian government.
>
> 4. According to the indictment, Palmera Pineda was a high-level member of the FARC who, together with Jorge Briceno Suarez, a/k/a Mono Jojoy, controlled and directed FARC drug trafficking activities and managed and controlled money for the FARC that was used to conduct cocaine trafficking activities. Jorge Briceno Suarez, a/k/a Mono Jojoy, is a member of the Secretariat, the first-tier governing body of the FARC, and he is the second most powerful leader of the FARC. Palmera Pineda was instrumental in planning, and conspiring to move FARC cocaine out of Colombia to the United States and other countries. In frequent meetings with FARC leaders, Briceno Suarez and Palmera Pineda directed FARC drug trafficking activities by issuing orders regarding the acquisition, transportation, and sale of cocaine by various FARC fronts, or units, and the movement of money. Palmera Pineda was in charge of handling money that was sent by FARC fronts to the FARC leadership. On various occasions, at the direction of Briceno Suarez, Palmera Pineda supplied billions of

> Colombian pesos, valued at millions of U.S. dollars, to other FARC members to further their drug trafficking activities.

The government is not required to reveal every single fact the defendant seeks in his sweeping request. Put simply, the defendant's requests for information go far beyond the proper scope and function of a bill of particulars. *See, e.g., Butler*, 822 F.2d at 1193 (where the indictment is sufficiently specific or if the requested information is available in some other form, a bill of particulars is not required); *United States v. Cisneros*, 26 F. Supp. 2d 24, 55-56 (D.D.C. 1998) (where a defendant has enough information to understand the charges alleged in the indictment against him and to conduct his own investigation of those charges, the government should not be required to prepare a bill of particulars).

## CONCLUSION

The amount of information which has been provided to the defendant in this case contains more than ample information such that the defendant is informed of the charges against him with sufficient precision that he can prepare his defense, and avoid any prejudicial surprise about the charge. More importantly, the defendant is sufficiently informed to protect him from subsequent prosecution for the same offense. For these reasons, no other bill of particulars should be required.

The government's compliance with its Rule 16 obligations in this case, along with written and oral recitations of the case have placed the defendant in a better position than even the most detailed bill of particulars might afford. Where, as here, the defense has received materials from which the nature and essence of the government's case can be easily understood, motions for bills of particulars have been consistently denied.

**WHEREFORE**, for the foregoing reasons, the United States respectfully asks the Court to deny the defendant's motion.

Respectfully submitted,

_____
Ronald M. McNeil
Stephen M. May
Jim Faulkner
Trial Attorneys

Narcotic and Dangerous Drug Section
U.S. Department of Justice
1400 New York Ave., NW, 8th Floor
Washington, D.C.  20005
202-514-0928

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was delivered to all parties via ECF on this date, December 15,  2006.

_____
Ronald M. McNeil
Narcotic and Dangerous Drug Section