UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| | * | |
| v. | * | Criminal No. 06-248 (JDB) |
| | * | |
| | * | |
| JUAN DANIEL DEL CID MORALES | * | |

**GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM FOR
DEFENDANT JUAN DANIEL DEL CID MORALES**

The United States respectfully submits this supplemental memorandum[1] concerning the appropriate sentence for defendant Juan Daniel Del Cid Morales, who was convicted after a week-long jury trial of Conspiracy to Unlawfully Distribute Five Kilograms or More of Cocaine, Knowing or Intending That It Would Be Unlawfully Imported Into the United States, in violation of 21 U.S.C. §§ 963, 959, and 960. For all the reasons set forth herein, the Government agrees with the findings of the Probation Office and requests that this Court sentence the defendant to a term of imprisonment of between 235 to 293 months. Such a sentence is within the statutory maximum provided by law for this offense and also would be consistent with the defendant's "advisory" Total Offense Level under the Federal Sentencing Guidelines. *See United States v. Booker*, 543 U.S. 220 (2005).

In *Booker*, the Supreme Court held that certain applications of the mandatory United States Sentencing Guidelines violated the Sixth Amendment, because they permitted the maximum allowable sentence to be enhanced based on judge-determined facts. As a remedy, the

---

[1] *See* Response to Sentencing Memorandum by USA. Docket No. 200.

Court invalidated the statutory provision that made the federal Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus making the Guidelines "effectively advisory." *Booker*, 543 U.S. at 245. Nonetheless, the Supreme Court held that in the future a district court must still "consult [the] Guidelines and take them into account when sentencing." *Id*. at 264 (citing 18 U.S.C. §§ 3553(a)(4) & (5)). "Under this new sentencing regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'" *United States v. Coumaris*, 399 F.3d 343, 351 (D.C. Cir. 2005) (internal quotations omitted). The "other statutory concerns" referred to in *Coumaris* are expressed primarily in 18 U.S.C. § 3553(a). *United States v. McCants*, 2006 WL 3086883 at p.4 (D.D.C.). The decisions which have issued since the *Booker* ruling have laid out a procedure for the imposition of sentences with the Guidelines acting only in an advisory capacity. Under these rulings, a sentencing court must first correctly determine the applicable Guidelines sentence, including any permissible departures, and then, after considering the Guidelines and all other factors in Section 3553(a), decide whether to apply the Guidelines sentence, or apply a non-Guidelines sentence. *See generally Kimbrough v. United States*, 128 S.Ct. 558 (2007); *see also United States v. Eura*, 440 F.3d 625, 632 (4th Cir. 2005); *United States v. Crosby*, 397 F.3d at 103, 111-13 (2d Cir. 2005).

  Moreover, pursuant to 18 U.S.C. § 3553(a), this Court is authorized to fashion a sentence that reflects, *inter alia*, "the nature and circumstances of the offense." In this case, a sentence of 235 to 293 months is an appropriate punishment for defendant Morales' participation in a conspiracy to transport in excess of one ton of cocaine to the United States. A sentence of this magnitude is also necessary to deter future criminal conduct by other foreign nationals who are engaged in international drug trafficking. Similarly, such a sentence comports with the intent of

Congress (and Sentencing Commission) to sufficiently penalize the source of this country's drug problems.

As the Court is well aware, the evidence at trial overwhelmingly established Morales' active membership in a conspiracy to unlawfully import cocaine into the United States. Initially introducing himself as a high ranking Guatemalan official, Morales positioned himself as an integral member in the safe passage of more than a ton of cocaine through the country of Guatemala with the intent and knowledge that the ultimate destination for the cocaine was the United States. But for the use of a covert DEA informant, Morales very well could have succeeded in sending such a large load of cocaine to the United States.

The Government agrees with the findings of the Probation Office that Morales is responsible for in excess of 150 kilograms of cocaine, which places him at a Level 38 in the advisory Guidelines. Throughout the conspiracy only two amounts of cocaine were discussed by either co-conspirators or the informant, 1000 kilograms and 1300 kilograms respectively. During a June 2006 meeting in Panama co-conspirator Jorge Bardales-Bourdet informed the Colombian trafficker (actually DEA informant) that the minimum deal must be "1000," which meant 1000 kilograms of cocaine. The following month, the informant in his role as drug trafficker informed Bardales-Bourdet and several co-conspirators, including Morales, that he had 1300 kilograms of cocaine to be transported to the United States. Morales also knew that this load would be brought in on a container ship for shipment through Guatemala to the Mexican border. There can be little doubt that the drug amount in this conspiracy involved well in excess of 150 kilograms of cocaine.[2] As presented at trial, an approximate street value of 1300 kilograms of cocaine in

---

[2] As stated in the Government's earlier response to the relevant conduct aspect of defendant's sentencing memorandum, Docket No. 200, Morales misstates the controlling law when he claims that this Court cannot determine a quantity greater than 5 kilograms without

the United States is $26,000,000.

Morales requests that this court impose a sentence approximately one half that of the presumptively reasonable guideline sentence. None of his arguments justify such a significant variance. Although Morales offers a number of cases to suggest a Guideline sentence for him would be offensive to the goal of minimizing sentence disparity, his argument misses the point. Thus, even in an advisory capacity a Guideline sentence offers presumptively reasonable sentences. A random sampling of cases offered to establish disparity can, and often does, result in a potentially limitless battle of factually distinguishable cases.

Nevertheless, the following cases argue that a Level 38 sentence (235-293 months) is reasonable and appropriate for Morales: *United States v. Martinez*, No. 03-00331 (D.D.C. 2003), *aff'd* 476 F.3d 961 (D.C. Cir. 2007) (48-year old defendant sentenced to 348 months for conspiracy involving 2,556 kilograms of cocaine); *United States v. Henry*, No. 02-00376 (D. D.C. 2002), *aff'd* 2007 Fed. Appx. 3 (D.C. Cir. 2006) (41-year old defendant sentenced to 288 months for 7.4526 kilograms of heroin); *United States v. Mejia*, No. 99-00389 (D. D.C. 1999) (40-year old defendant sentenced to 400 months for conspiracy involving 2,374 kilograms); *United States v. Rios*, (D.D.C. 1999) (43-year old defendant sentenced to 324 months for conspiracy involving 477 kilograms of cocaine); *United States v. Montoya-Sanchez*, No. 99-00804 (SDFL 2006)(43-year old defendant sentenced to 262 months following plea; factual proffer only quantified drug amount as 5 kilograms or more); *United States v. Osorio-Norena*, No. 00-10224 (D. Mass 2006)(34-year old defendant sentenced to 262 months for conspiracy to

---

violating the 5th and 6th amendments. *Booker* resolved any constitutional issue once it held the Guidelines advisory. After *Booker*, *Rita*, and their progeny it is beyond dispute that courts have the authority to determine quantities beyond the mandatory minimum by a preponderance of the evidence.

distribute cocaine (50-150 kilograms of cocaine) and money laundering, according to a post-sentence press release).[3]

Post-*Booker,* § 3553(a) does not ban all disparities, only *unwarranted* ones. *United States v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005). As the *Newsom* court correctly stated:

> While comparisons are appropriate, it is important in the first instance to recall that the Guidelines were intended to create national uniformity, and that this goal remains important post-*Booker*. It is not enough for a defendant to argue that a few cases from any particular circuit seem to cast doubt on his sentence. In addition, one needs to know more than the crime of conviction and the total length of the sentence to evaluate disparities; the specific facts of the crimes and the defendant's individual characteristics are also pertinent.

*Id.*

Moreover, aberrant sentences like *Valderrama,* Def. Memo p.6, do not suggest what is a reasonable sentence, quite the opposite. Such gross departures fly in the face of congressional intent and, absent something taking the case outside the 'heartland,' makes sufficient justification improbable. *See Kimbrough v. United States*, 128 S.Ct. *At 575; Gall v. United States*, 128 S.Ct. 586, 594 (2007). In short, the instant case presents no facts warranting a departure or enhancement beyond the advisory Guideline range of 235 months to 293 months.[4]

Morales is Not Entitled to an Adjustment for His Role in the Offense

An adjustment under § 3B1.2 is proper for participants of a crime who are (substantially)

---

[3] *Mejia* and *Rios* were prosecuted together, and their convictions affirmed upon appeal. *Mejia v. United States*, 448 F.3d 436 (D.C. Cir. 2006), although their cases were remanded for resentencing under *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005). Their sentences were remanded only because of the immediate wake and uncertainty of *Booker*, not because of any suggestion of unreasonableness.

[4] It is worth noting that 1300 kilograms is almost ten times the amount of cocaine required to attain a Level 38. *See also* U.S.S.G. § 2D1.1, n. 16 (suggesting an upward departure may be appropriate in cases involving ten times the minimum quantity required for Level 38).

Furthermore, the Government reasserts its argument regarding the proof of the existence of a single conspiracy. Docket No. 181. Again, the overwhelming evidence adduced at trial clearly established that Morales was in a single conspiracy. As such, no mitigation is justified.

less culpable than average participants. *See* § 3B1.2, nn. 3 & 4; *see also United States v. Soto*, 132 F.3d 56, 58 (D.C. Cir. 1997)("Did [the defendant] play a particularly passive role or have little or no knowledge of the larger distribution scheme? Was [the defendant] sentenced based on relevant conduct in which other actors played a part? Do other circumstances demonstrate that [the defendant's] culpability [is] less than others involved in the scheme?").

Simply put, the facts that proved Morales' guilt beyond a reasonable doubt do not support a downward adjustment for his participation in the conspiracy. Morales crossed international borders on at least three occasions to meet with an individual he thought was a Colombian drug trafficker who wanted to move 1300 kilograms of cocaine through Guatemala; two of those meetings were videotaped. At the first meeting in El Salvador, Morales introduced himself as a *high* ranking Guatemalan police official ("Ovidio Fajarda Aldona"). Morales never attempted to minimize his role in the Guatemalan government (either current or former) by suggesting, perhaps, that he was a merely beat cop. Morales took $10,000 (USD) in cash at this meeting from the Colombian–who was a covert DEA informant–and can be seen placing the money in his pocket. At the conclusion of this meeting, Morales is seen and heard having a private conversation with the informant. Morales warns the informant (who he thinks is a trafficker) that the DEA is assisting in the start-up of new Guatemalan police agency and stresses that their drug deal must be completed within a narrow time frame to avoid detection.

At the next meeting, Morales is seen at the same table with co-defendants Constanza-Bran and Mejia while Bran draws a sketch depicting where the load of cocaine would be hidden on a container ship and while front business paperwork is passed to the informant. Although not videotaped, Morales traveled with Constanza-Bran and Mejia for a third meeting in El Salvador, expecting to receive monies for the front business ($20,000 USD); instead all three men were

arrested. Following his arrest, Morales provided a statement to DEA that established Morales' knowledge of the entire plan and detailed his key role as facilitating the cocaine's transit to the Mexican border.

Moreover, in a series of consensually recorded phone calls between the informant and Constanza-Bran, there are multiple references to "Ovidio"–the alias used by Morales. In one call, Bran specifically tells the informant that "Ovidio" (along with Mejia) are working to make changes at the border. In short, these calls further suggest Morales' more than minor or minimal involvement throughout the summer of 2006 in this conspiracy.

Even accepting Morales' position that his role was one of "security" in the conspiracy, in this case, "security" means far more than merely standing a post. Morales was present at all the key El Salvador meetings where the details of the cocaine deal were planned and moved forward. Although Constanza-Bran's responsibility lied in assuring safe passage *into* the country of Guatemala, it was Morales' responsibility (along with Mejia) to ensure its safe storage and subsequent transportation *through* Guatemala to the Mexican border. Even if, arguably, others had a management or leadership position in the conspiracy it does not diminish the role Morales himself played.

Morales is Not Entitled to an Adjustment Based Upon Health/Age/Family Circumstances

Neither age or physical impairment are ordinarily relevant to determine whether an adjustment is warranted. *See* U.S.S.G. §§ 5H1.1; 5H1.4. However, "an extraordinary physical impairment" is one reason to consider a reduction in sentence.[5]  § 5H1.4. Morales cites to a

---

[5] Section 5H1.1 requires a defendant to be elderly *and* infirm. The Defendant is only (50) years of age and can hardly be termed "elderly." *Cf. United States v. Brooke*, 308 F.3d 17 (D.C. Cir. 2002)(affirming district court's finding that 82 year-old convicted drug trafficker with history of respiratory problems, chest pain, painful knee requiring constant draining, and arthritis of the joints did not rise to a level of an extraordinary physical impairment).

myriad of cases that received downward departures because of various health concerns.  None of the cases cited by Morales come close to the two relatively common conditions ascribed to the Defendant. *See e.g., United States v. Wadena*, 470 F.3d 735 (8th Cir. 2006) (affirming a variance sentence from 18-24 months to a five year term of probation based upon defendant's age, chronic health conditions, and role as sole caretaker for his adopted adult son, who suffered from fetal alcohol syndrome; defendant was 67 and suffered from various chronic health conditions, including hypertension, hearing loss, cataracts, Type II diabetes, and kidney disease, which required defendant to receive three-hour dialysis treatments three times per week).  Moreover, Morales does not suggest that his conditions are unstable or are in any way uncontrolled.  Lastly, the Defendant fails to articulate how he would receive better health care in his country of Guatemala vis a vis care in the United States Bureau of Prisons.

Just as age and health are not normally relevant to downward adjustments, so too are family circumstances.  *See United States v. Tucker*, 386 F.3d 273, 278-78 (D.C. Cir. 2004)(*citing Koon v. United States*, 518 U.S. 81, 95-96 (1996)("[D]epartures based on employment history or family responsibilities are rare, but permitted.  Both are discouraged factors for downward departures. As discouraged factors, neither may be a basis for a departure unless it is present 'to an exceptional degree.'"); U.S.S.G. § 5H1.6.  Indeed, Congress intended to "assure that the guidelines and policy statements are entirely neutral as to the race, sex, national origin, creed, and socioeconomic status of offenders." *United States v. Smith*, 27 F.3d 649 , 654 (D.C. Cir. 1994). (quoting 28 U.S.C. § 994(d)). Morales fails to overcome his burden to show how his situation is so extraordinary to reasonably justify a downward adjustment based upon any of these factors.[6]

---

[6] The family circumstances is true of virtually all 21 U.S.C. § 959 defendants.  Congress singled out such international traffickers by passing § 959.  It is illogical for foreign citizens to receive a sentence reduction by virtue of their nationality.

Morales Should Not Receive a Variance Based on his Alien Status

      Morales also requests a variance from the Guideline range based on his status as a deportable alien, pursuant to *Smith*, 27 F.3d 649. Def. Memo at 12. He offers no compelling reason for a variance based solely on his immigration status, and, indeed, no such variance is warranted in this case.

      In *Smith*, a case decided prior to *Booker*, the D.C. Circuit considered whether the mandatory Guidelines provided a basis for a downward departure. The *Smith* Court held that "a downward departure *may be appropriate* where defendant's status as a deportable alien is likely to cause a fortuitous increase in the severity of his sentence." *Smith*, 27 F.3d at 655 (emphasis added). Far from being mandatory, as defendant's summary argument suggests, Def. Memo at 12, the downward departure in *Smith* was to be "highly infrequent." *Smith*, 27 F.3d at 655. Following *Booker*, this Court has considerable discretion on the factors it considers, but the analysis in *Smith* still provides a benchmark for the reasonableness of reducing a defendant's sentence based on his immigration status. Using *Smith* as guidance in the instant case, reducing defendant's sentence by any amount based on his immigration status is not reasonable.

      First, as the *Smith* Court held, "[f]or a departure on such a basis to be reasonable the difference in severity must be substantial and the sentencing court must have a high degree of confidence that it will in fact apply for a substantial portion of the defendant's sentence." *Ibid.* Here, defendant makes no effort to satisfy this standard. Rather, in a one-sentence conclusory statement, defendant states simply that "[c]learly, Mr. Morales will not have access to work-release programs or early release programs that are available to similarly situated defendants that are not deportable." Def. Memo. at 6. This is insufficient. In this case, defendant faces a 20-year sentence under the Guidelines; any early release programs would not apply to a "substantial

portion"of his sentence. Therefore, a variance is unwarranted.

Second, even assuming that defendant's ineligibility for such programs would constitute an increase in his sentence, the *Smith* Court emphasized that such a finding, standing alone, "was insufficient to justify a departure. Instead, a court should only depart if it is 'persuaded that the greater severity is undeserved.'" *United States v. Olivares*, 473 F.3d 1224, 1231 (D.C. Cir. 2006) (quoting *Smith* 27 F.3d at 655). If defendant's assertions were sufficient, then all non-U.S. citizens would be eligible for a sentence reduction and the variance would be automatic. *Smith* makes clear that this is not so. *Smith*, 27 F.3d at 655.

Finally, there is nothing "fortuitous" about defendant's immigration status. In passing 21 U.S.C. § 959, Congress specifically criminalized the extraterritorial distribution of certain controlled substances. As past case law had demonstrated, virtually all § 959 defendants will be foreign citizens who are paroled into the United States for prosecution. Under defendant's approach, all foreign citizens would receive beneficial treatment for sentencing purposes, even if their crimes were drug trafficking or terrorism crimes directed at the United States. This is unreasonable. As the *Smith* Court held, "a deportable alien is by no means necessarily unrelated to his just deserts." *Smith*, 27 F.3d at 655. Here, defendant chose to target the United States as the destination for large quantities of cocaine, and he attempted to avoid the consequences of those actions by operating outside the jurisdiction of the United States. His status as a deportable alien is a direct consequence of his own actions, and it would be irrational to reward him for the unique nature of his criminal activity.

**CONCLUSION**

For all of the foregoing reasons, the Government respectfully requests that defendant Juan Daniel Del Cid Morales receive a sentence of between 235-293 months.

Respectfully submitted,

_____/s_____
Brian M. Tomney
Paul W. Laymon
Trial Attorney
Narcotic and Dangerous Drugs
Department of Justice
1400 New York Avenue NW
Washington, DC 20005
Phone    202-307-1383
Facsimile  202-514-1483
Brian.Tomney@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that a copy of this response was sent via e-mail to defense counsel 6 May 2008.

_____/s_____
Brian M. Tomney